UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT J. LARRY,

Case No. 3:16-cv-1892-AC

Plaintiff,

OPINION AND ORDER

v.

STATE OF OREGON, by and through
OREGON DEPARTMENT OF HUMAN
SERVICES, by and through OREGON
VOCATIONAL REHABILITATION
SERVICES; TRINA LEE, Director of Oregon
Vocational Rehabilitation Services; ROBERT
COSTELLO, DONNA DUFF, TRACY
SCHAFFER, SARAH SANDRUDDIN,
MARK MASTHOFF, JOHN DOES 1-10, all
in their individual and official capacities; DR.
ROBINANN COGBURN, and DR. LUAHNA
UDE, Contractors of Oregon Vocational
Rehabilitation Services, in their professional
and individual capacities,

Defendants.

_____

ACOSTA, Magistrate Judge:

## *Introduction*

Plaintiff Robert J. Larry ("Larry") filed this action against the State of Oregon (the "State") and various state agencies, employees, and agents alleging claims for disability discrimination and failure to accommodate in violation of the Rehabilitation Act of 1973 (29 U.S.C. §§ 701-796) (the "Act"), and common law claims for intentional infliction of emotional distress ("IIED") and vicarious liability. Currently before the court are the defendants' motions for summary judgment.

The court finds a two-year statute of limitations applies to Larry's claims under the Act and Larry has failed to offer evidence he was otherwise qualified for the specific services requested, defendants denied such services solely on his disability, or defendants acted with deliberate indifference in denying such services. With regard to Larry's common law claims, the court finds the Oregon Tort Claims Act applies, Larry provided proper tort-claim notice on March 23, 2016, defendants' actionable conduct was not intended to inflict emotional distress on Larry nor was it beyond the bounds of socially tolerable conduct, and, in the absence of a viable claim against the individual defendants, vicarious liability does not exist. Accordingly, defendants' motions for summary judgment are[1] all granted and this lawsuit is dismissed with prejudice.

## *Preliminary Procedural Matters*

On January 30, 2018, one day after Robinann Cogburn, Ph.D. ("Dr. Cogburn"), filed the first motion for summary judgment motion in this matter, the court issued and mailed to Larry, who is appearing *pro se*, a summary judgment advice notice (the "SJ Notice"). The SJ Notice advised Larry

---

[1]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

that:

> The defendants have made a motion for summary judgment (Motion for Summary Judgment [76]) by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case.

> Rule 56 tells you what you must do in order to oppose a motion for summary judgment. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or others materials, as provided in Rule 56(c), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine dispute of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial.

(Summ. J. Advice Notice, ECF No. 83.)

The only materials initially submitted by Larry in opposition to the pending motions for summary judgment are declarations signed by Larry [2] and Shea A. Lott, Ph.D. ("Dr. Lott"),[3] on June 11, 2018, and exhibits[4] attached to the Lott Declaration. The exhibits include communications to and from Larry or between others about Larry, responses to Larry's appeals, various guides and policies of defendants Oregon Vocational Rehabilitation Services (the "Agency") and Oregon

---

[2] Larry filed two identical declarations signed by him on June 11, 2018, identified as ECF Nos. 122 and 124. The court will refer to both declarations as the "Larry Declaration" and will cite to only ECF No. 122

[3] Larry also filed two identical declarations signed by Dr. Lott on June 11, 2018, identified as ECF Nos. 125 and 126. The only distinguishing feature of the declarations are the exhibits attached. The court will refer to both declarations as the "Lott Declaration," will cit to only ECF No. 125, and will refer to the two exhibits attached to the second filed declaration, specifically ECF No. 126, as Exhibit 1A and Exhibit 2A.

[4] The exhibits attached to the Lott Declaration are not clearly numbered. Consequently, the court assigns each exhibit a number when initially referenced and described.

Department of Human Services (the "Department"), and a hearing request signed by Larry. While Larry cites to a number of depositions in his initial opposition materials, he did not offer any deposition transcripts until obtaining leave of court at oral argument to supplement his opposition materials with deposition excerpts.[5]

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c) (2018). The court has the obligation to determine what evidence is admissible, relevant, and substantive. FED. R. EVID. 104 (2018). In ruling on a motion for summary judgment, the court will consider the admissibility of the proffered evidence's contents, not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its content."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). To lay the foundation for receipt of a document in evidence, the party offering the exhibit must provide the "testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery." *United States v. Dribble*, 429 F.2d 598, 602 (9th Cir. 1970).

The statements in the Larry Declaration and the Lott Declaration are limited to material of which the declarants have personal knowledge and are properly before the court. However, Dr. Lott

---

[5]In his opposition briefing, Larry attempts to incorporate all facts alleged in his First Amended Complaint. The SJ Notice clearly and unequivocally informs Larry he can not rely on what his complaint says but must offer specific facts in materials provided by him to contradict the facts offered by the defendants. The court will not consider the allegations of the First Amended Complaint as facts unless supported by Larry's evidentiary offerings.

does not appear to lay the requisite foundation to offer exhibits attached to the Lott Declaration. Dr. Lott does not refer to or describe the exhibits in his declaration[6] and fails to establish the personal knowledge required to authenticate the exhibits. Dr. Lott does indicate he "requested complete copy of Mr. Larry's file from Dr. Cogburn" and refers to "all the documentation that has been provided to me, including Dr. Ude's review of Dr. Cogburn's psychological evaluation" implying some, if not all, of the exhibits were provided by Dr. Cogburn, the Agency, or the Department. (Lott Decl. dated June 11, 2018, ECF No. 125, ¶¶ 4, 11.)

To the extent the exhibits were provided to Dr. Lott by defendants and defendants have not objected to them, they are properly before the court for the purposes of a summary judgment motion. On the other hand, if defendants did not provide the exhibits, Dr. Lott has failed to properly authenticate them and the court must determine if they could be made admissible in a trial setting.

Some of the exhibits could be offered and authenticated by Larry at trial. Specifically, Exhibit 1, an email from Dr. Lott to Larry indicating the Lott Declaration was signed and available to be picked up; Exhibit 3, an October 24, 2014 letter from Larry to Cogburn, defendant Tracy Schaffer, an Agency counselor ("Schaffer"), and defendant Donna Duff, an Agency branch manager ("Duff"); Exhibit 5, a letter from Schaffer to Larry; and Exhibit 2A, a request for an impartial hearing signed by Larry, are all within Larry's personal knowledge, would be admissible at trial once Larry offers the foundation, and will be considered by the court.[7] Additionally, Dr. Lott could provide the foundation for Exhibit 1A, which is a letter signed by Dr. Lott.

---

[6]Larry represents "[a]ll exhibits are true copies" in his declaration but no exhibits are attached to the Larry Declaration.

[7]Exhibits 5 and 2A were also offered and authenticated by one or more of the defendants.

Exhibit 2 is a letter dated August 18, 2014, from Dr. Cogburn transmitting her "report regarding Bobby Larry" to Schaffer.[8] The defendants do not dispute Dr. Cogburn shared her findings with Schaffer or the date on which such sharing occurred. The court will consider these facts established.

Exhibit 4 appears to be an Agency review of a discrimination complaint made by Larry against Schaffer, Duff, and another Agency counselor in which Mary Shivell, the Agency's Interim Field Manager, found the services provided were poorly organized and researched, and deficient with regard to understanding the process, consumer rights related to information, and adherence to time dispute resolution procedures, but determined none of the issues were related to Larry's disability. In the event Larry received a copy of the exhibit, which is likely as it addresses a complaint filed by him and informs him of his appeal rights, he could authenticate the exhibit at trial. Similarly, Larry could call the author of the exhibit to testify to the authenticity of the document. The court will consider Exhibit 4.

Exhibit 6 is an unsigned, undated copy of a review[9] of two prior psychological evaluations of Larry performed by defendant Luahna Ude, Ph.D. ("Dr. Ude"), apparently at the request of defendant Robert Costello, an Agency manager or supervisor[10] ("Costello"), and defendant Sarah Sadruddin,[11] an Agency counselor ("Sadruddin"). In his declaration, Dr. Lott references Dr. Ude's

---

[8]Exhibit 2 was also offered and authenticated by one or more of the defendants.

[9]The exhibit omits the first words or portions thereof on page one and the last word or portions thereof on page two, making it impossible to fully understand the text.

[10]Larry identifies Robert Costello as "a Branch Manager and/or a Regional Supervisor for [the Agency]." (First Am. Compl., ECF No. 41, ¶8.)

[11]Sadruddin is identified as Sarah Sandruddin in the First Amended Complaint.

review of Dr. Cogburn's psychological evaluation of Larry and could identify Exhibit 6 at trial as the document he reviewed. The exhibit bears an exhibit label, impliedly establishing the exhibit was identified and discussed during Sadruddin's deposition, making it likely Sadruddin could authenticate the document at trial. Finally, Dr. Ude, as the author of the document, could testify to its authenticity. However, due to the unsigned, undated nature of the exhibit, the court will consider it merely as a draft of Dr. Ude's review of Larry's previous psychological evaluations and the document on which Dr. Lott relied in reaching the conclusions stated in the Lott Declaration. It is unclear to what degree any defendant relied on Exhibit 6 in making decisions related to Larry so the relevance of the content of the exhibit is limited.

Finally, Exhibits 7 and 8 are copies of Agency guidelines and policies governing self-employment, portions of which are undated, or identified as "initiated" on January 1, 2015, or revised on September 28, 2011. The Agency provided Larry certain Agency guidelines and policies, which Larry complained were outdated. Larry, as well as many defendants, may lay the foundation for the guidelines and policies provided him, and those relevant to his claims. However, it is unclear whether the exhibits contain outdated guidelines and policies or those relevant to the handling of Larry's request for assistance. The court will consider the exhibits and the general requirements found therein, but will not rely on specific requirements set forth the exhibits as they apply to Larry's claims.

In his supplemental briefing filed after oral argument, Larry offers two pages from Cogburn's deposition without any material authenticating the excerpts. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a) (2018).

A deposition excerpt is ordinarily authenticated "by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted." *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002). However, "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity." *Orr*, 285 F.3d at 776.

At least one defendant offered properly authenticated excerpts from the Cogburn deposition. The excerpts offered by Larry are consistent, both in content and appearance, with the properly authenticated excerpts offered by the defendants. Consequently, the court will consider Larry's deposition excerpts in this Opinion.

Larry also offered an email chain from July 25, 2014 and July 26, 2014, between Schaffer and Kedma Ough ("Ough") discussing Larry's initial meeting with Cogburn and the need to continue Larry's evaluation on another day. The order allowing supplemental briefing was limited to the filing of a brief and deposition excerpts, and did not contemplate the filing of additional evidence. Consequently, the email chain is not properly before the court. However, in light of Larry's *pro se* status, his representation the "State Defendants" produced the emails during discovery, Schaffer's ability to authenticate the emails at trial, and the lack of prejudice to defendants, the court will consider the emails to the extent relevant to the issues before the court.

### Background

Larry's claims are based on a denial of his request for self-employment assistance from the Agency due primarily to the results of Dr. Cogburn's psychological evaluation of Larry. (Larry Dep.

dated July 28, 2017,[12]   30:20-32:23.)  The Agency is a federally-funded state agency providing general vocational rehabilitation services to Oregon residents.  (Lee Decl. dated April 13, 2018, ECF No. 106, ¶¶ 1, 3.)  The Agency "assists individuals with disabilities in getting and keeping a job, as well as assisting in advancing careers that match their skills, interests, and abilities" by providing "assessment services, counseling and guideline services, training services, and employment services." (Lee Decl. ¶¶ 3, 5.)

Only individuals with disabilities, defined "as a physical or mental impairment that constitutes or results in substantial impediment to employment," qualify for vocational rehabilitation services.  (Lee Decl. ¶ 8.)   Each prospective client of the Agency participates in an assessment, which includes administration of a variety of vocational tests intended to determine if a person will benefit from services provided by the Agency.  (Lee Decl. ¶ 9.)  If an individual is found eligible, the Agency will prepare an individualized employment plan providing services unique to each client. (Lee Decl. ¶ 9.)

A very small percentage of individuals eligible for Agency services also qualify for self-employment assistance.[13]  (Lee Decl. ¶ 10.)  Additional eligibility criteria for those wishing to pursue self-employment or start a small business include:

> a concise description of the proposed self-employment/business; an explanation of how self-employment meets an individual's needs better than wage employment; a list of any past training and work experience that may help qualify the individual to own and operate a business; a vocational profile or functional assessment that

---

[12]Portions of the Larry Deposition are found at Exhibit 23 to the Schneider Declaration (ECF No. 105) and Exhibit 1 to the Madigan Declaration (ECF No. 109).

[13]National statistics reveal clients eligible for self-employment assistance range from 1.97 percent in 2003, to 1.66 percent in 2007, 1.99 percent in 2009, and 2.4 percent in 2012.  (Lee Decl. ¶ 11.)

supports the idea of owning a small business; a list of any past training and experience (both work and non-work) that demonstrates the individual's ability to produce the product or service of the business; documentation that the individual can substantially contribute to the enterprise; feasibility data that shows the need for the service or business in the market; an explanation of pricing and profit projections; a plan for marketing and advertising that grows the business; a description of how business operations and accounting records for the business will be handled[;] proposed start-up budget and the sources of the funds (e.g., sales, PASS Plan, VR); and at least one-year financial estimate including operating expenses, income, profit, taxes, income after taxes.

(Lee Decl. ¶ 10.)

Larry filed an application for Agency services in 2008 claiming disability based on a back injury and depression. (Schneider Decl. dated April l3, 2018, ECF No. 106, Ex. 1.) The Agency obtained documentation supporting Larry's back injury but nothing to substantiate his claim of depression. (Schneider Decl. Ex. 1.) The Agency closed the application for lack of cooperation in the Fall of 2008 when Larry refused to follow through with the psychiatric evaluation necessary to support his depression diagnosis. (Schneider Decl. Exs. 1, 2.)

Larry filed a second application on January 8, 2013, claiming he was disabled due to major depressive order, post traumatic stress disorder, and a shoulder and back injury (the "Application"). (Schneider Decl. Ex. 3 at 1, 5-6.) He sought "help with deciding on a work goal, help finding a job, skill development, and help learning how to disclose his criminal records and disability with potential employers." (Schneider Decl. Ex. 3 at 6.) At the time of the Application, Larry had over two years experience as a caregiver and was working sixteen hours a week in this position. (Schneider Decl. Ex. 3 at 4, 7.) He expressed a desire to get a "CNA to help him get better jobs as a caregiver" and "qualify to be a residential manager." (Schneider Decl. Ex. 3 at 6, 7.)

Larry was initially assigned to work with Schaffer, who had a Master's degree in

rehabilitation counseling and was a certified rehabilitation counselor. (Schaffer Dep. dated March 12, 2014[14] 9:11-22.) During their April 2013 initial meeting to set goals and assign homework, Schaffer asked Larry to research different CNA programs and obtain information about available financial aid and the fee for new vehicle license tags, and an estimate on the cost to replace the tailpipe on his vehicle to enable it to pass DEQ. (Schneider Decl. Ex. 4.) Schaffer also requested Larry pursue a grant from SE Works[15] to assist in the cost of the CNA training. (Schneider Decl. Ex. 4.) Schaffer and Larry discussed additional needs, such as interview clothing, dress shoes, and a bus pass. (Schneider Decl. Ex. 4.)

On June 19, 2014, Larry and Schaffer met with Ough, who held an MBA, to discuss the feasibility of Larry's new plan to open an adult care home. (Schneider Decl. Ex. 6 at 1.) Ough authored a three-page initial report summarizing the meeting, identifying numerous tasks to be performed by Larry and Ough, and classifying the case as "complex" in light of the regulations and in-depth requirements governing adult care homes. (Schneider Decl. Ex. 6.)

A July 7, 2014 physical capacity evaluation by Angela Lynn Brown, PT ("Brown") revealed Larry was capable of full-time work in the medium range of physical demand. (Schneider Decl. Ex. 7.) In late July and early August, 2014, Dr. Cogburn performed a two-day psychological evaluation of Larry on Schaffer's referral to "assess Mr. Larry's occupational capacity and rehabilitation needs" (the "Evaluation"). (Schneider Decl. Ex. 8; Cogburn Decl. filed January 29, 2018, ECF No. 77, ¶ 3.)

---

[14]The Schaffer Deposition is Exhibit 26 to the Schneider Declaration (ECF No. 105).

[15]SE Works is an organization that provides financial assistance to individuals with a criminal history. (Schneider Decl. Ex. 4.)

At the beginning of their first meeting, Dr. Cogburn provided Larry with a "Informed Consent" form (the "Consent"). (Cogburn Decl. ¶ 3.) The Consent explained the Agency requested a psychological evaluation because it needed to know more about Larry, including an opinion on Larry's diagnosis, whether Larry had "any kind of mental or emotional condition, learning disability, or related issue," and providing information on Larry's "interests, abilities, strengths, and weaknesses." (Cogburn Decl. Ex. 1 at 1.) Dr. Cogburn would provide this information in a report that would include a diagnosis and recommendations regarding services that might help Larry, job tasks that might be harder or easier for him, accommodations that would allow him to succeed, and work settings that might a better or worse fit for him. (Cogburn Decl. Ex. 1 at 1.) The Consent specifically advised Larry the report would be an Agency document, stating:

> The report I write will be an [Agency] document. I will give it directly to your [Agency] counselor, or if that person is not available, to other [Agency] staff. Release of the report contents is at [Agency] discretion. I do not provide results directly to you. However, if you have questions or concerns about the results after you meet with your [Agency] counselor, you may ask your counselor to set up an appointment with me.

(Cogburn Decl. Ex. 1 at 1.)

With regard to confidentiality, Dr. Cogburn agreed not to provide any information about Larry to anyone other than Agency staff unless Larry was planning to hurt himself or others, or he reported a child or an elderly or disabled person was being abused. (Cogburn Decl. Ex. 1 at 1-2.) The Consent expressly advised Larry "[t]here is no legal privilege of confidentiality in administrative evaluations. This means that if a court were to subpoena my records or order me to testify about you I would have to provide the information that I have." (Cogburn Decl. Ex. 1 at 2.) The Consent informed Larry of possible risks resulting from the Evaluation as follows:

> [I]t is possible that you could be surprised by evaluation results or disagree with my conclusions or recommendations. In such a situation, you may feel distressed. Also, [Agency] staff may use information from this evaluation to make decisions about your eligibility for services, or about whether specific services will be provided for you. You may disagree with the decisions they make, or feel that their decisions are not in your best interest. I do not make these decisions myself, and I do not try to promote any particular outcome. Instead, I try to provide clear and unbiased information.

(Cogburn Decl. Ex. 1 at 2.) Finally, the Consent explained Dr. Cogburn is not an employee of the Agency and maintains an independent private practice with files, billing procedures, and clinical practices. (Cogburn Decl. Ex. 1 at 2.) Larry signed the Consent on July 25, 2014, expressly acknowledging he read the Consent, had the opportunity to ask questions about the Evaluation and have issues explained to him, and agreed to participate in the Evaluation under the conditions stated in the Consent. (Cogburn Decl. Ex. 1 at 2.) The Consent did not provide information on how to stop or withdraw from an evaluation. (Cogburn Dep. dated March 14, 2018,[16] 69:4-25.)

In her report dated August 18, 2014, summarizing the Evaluation, Dr. Cogburn acknowledged a 2012 psychological evaluation found Larry "was affected by major depressive order and post-traumatic stress disorder" related to a criminal trial in which Larry was convicted of reckless endangerment and sentenced to probation in 2007. (Schneider Decl. Ex. 8 at 1-2.) Larry initiated the 2012 evaluation, selecting the evaluator because he "understood minorities and the court system" and it would be helpful to talk with someone who "understood [Larry] as a black man." (Schneider Decl. Ex. 8 at 2-3.)

Larry was "polite, but cautious and sometimes somewhat defensive and/or confrontational"

---

[16] Portions of the Cogburn Deposition are found at Exhibit 24 to the Schneider Declaration (ECF No. 105) and Exhibit 1 and 3 to the Larry declarations filed January 19, 2019 (ECF No. 140 and 142).

during the initial meeting with Dr. Cogburn. (Schneider Decl. Ex. 8 at 7.) Larry appeared highly goal-oriented and expressed concern the Agency may not entirely support him in his request for start-up capital and other services to allow him to open his adult care home. (Schneider Decl. Ex. 8 at 11.) Dr. Cogburn described Larry's speech content as "verbose and overly inclusive of detail," and noted his "lengthy play-by-play narratives of events" in response to questions increased the interview time from 1.5 hours to 2.5 hours and required the scheduling of a second meeting to complete the testing. (Schneider Decl. Ex. 8 at 7.)

Larry initially focused on discussing the proper interpretation of the Agency manual with Dr. Cogburn but his attention was redirected when Dr. Cogburn explained interpretation of manuals was not within her expertise and her role "in relation to his self-employment goal was related to providing information to help determine whether he is affected by functional limitations that would affect his ability to operate the proposed business." (Schneider Decl. Ex. 8 at 4-5.) Larry expressed dissatisfaction with the Agency's "slow progress," and described his participation in the Evaluation as a "major setback," noting the Evaluation should have occurred in January 2013 when he completed the Application. (Schneider Decl. Ex. 8 at 3.)

Larry also complained about Agency staff, explaining his counselor gave him an outdated version of the Agency manual and when he asked her to email him a current version, she lied about the existence of electronic versions of the current manual.[17] (Schneider Decl. Ex. 8 at 4.) Larry reported feeling "manipulated" by the Agency and was concerned the Agency was resistant in moving toward his goal of self-employment, surmising the Agency had not been involved with many

---

[17]The counselor did provide him with a paper copy of the current version of the Agency manual. (Schneider Decl. Ex. 8 at 4.)

requests for self-employment assistance. (Schneider Decl. Ex. 8 at 4.) He indicated his "primary stress [was] related to his interactions with [the Agency]." (Schneider Decl. Ex. 8 at 8.)

Larry objected to Dr. Cogburn's questions regarding his ethnic and cultural background, stating he "identifies as an American." (Schneider Decl. Ex. 8 at 5.) Larry also expressed concern over Dr. Cogburn's ability to perform a proper evaluation, questioned Dr. Cogburn's experience with individuals involved in court proceedings, and planned to inquire about other psychologists under contract with the Agency. (Schneider Decl. Ex. 8 at 7.)

Larry appeared "more guarded" during the second meeting and requested he be allowed to record his interactions with Dr. Cogburn. (Schneider Decl. Ex. 8 at 7.) Dr. Cogburn explained the standardized tests were protected and could not be recorded. (Schneider Decl. Ex. 8 at 7.) She then informed Larry she would need to record any interactions he recorded and, as she did not have recording equipment available, offered to reschedule the second meeting to allow both of them to record their interaction at a later date. (Schneider Decl. Ex. 8 at 7.) Larry agreed to complete the Evaluation that day without recording the interaction. (Cogburn Decl. ¶ 7.)

Larry commented at some length on the proper interpretation of the "Limits of Confidentiality" provision found in the Consent. (Schneider Decl. Ex. 8 at 7.) They eventually agreed the provision allowed Dr. Cogburn to provide information about Larry only if her records were subpoenaed, or a court ordered her to produce records or testify. (Schneider Decl. Ex. 8 at 7.) Larry commented the language was unclear and should be revised. (Schneider Decl. Ex. 8 at 7.) Dr. Cogburn noted Larry's "unusual focus on details and litigious matters suggested distrust and vigilance." (Schneider Decl. Ex. 8 at 7.)

Dr. Cogburn performed numerous tests and diagnosed Larry with mild neurocognitive

disorder with deficits in executive functions, obsessive-compulsive personality disorder (provisional), and partially resolved post-traumatic stress disorder, with residual distrust and vigilance. (Schneider Decl. Ex. 8 at 11.) Dr. Cogburn generally noted Larry's intellectual functioning was within the average range with evidence of deficits in executive functions and indications suggesting narcissistic, obsessive-compulsive, and paranoid features. (Schneider Decl. Ex. 8 at 10-11.) She cautioned his "[e]xecutive function impairment may affect functioning across multiple domains on tasks requiring cognitive flexibility, fluid problem-solving, and complex organization" and his "[p]roblematic personality features are likely to lead to limitations in interpersonal functioning." (Schneider Decl. Ex. 8 at 12.) Dr. Cogburn's recommendations provided:

1. Mr. Larry's average intellectual functioning and post-secondary level academic skills would be expected to support success in a wide variety of occupational task that are otherwise suited to his strengths.

2. Due to executive functions deficits, Mr. Larry would be expected to succeed most easily when performing tasks with well-established procedures and consistent task demands. He may have more difficulty in situations where he must respond to emerging problems or task demands and generate solutions on a fluid, situation-related basis.

3. Also related to executive function deficits, Mr. Larry is likely to succeed most easily if he performs tasks sequentially (i.e., completes one task them moves to another). He may have more difficulty if he [is] asked to keep track of multiple task sequences simultaneously or switch back and forth between multiple tasks in progress.

4. Mr. Larry's success may also be supported by providing specific, well-defined assignments. If he were to be assigned a large goal or project, he should receive support in areas of identifying components, developing a plan, organizing and coordinating elements, and prioritizing details. Support should include coaching, evaluation of his work as he completes each step, and feedback as needed. However, as discussed below, evidence of problematic personality functions raises some questions as to whether he

would accept such support.

5.     Mr. Larry demonstrates above-average interest in the accuracy and consistency of details. This suggests that he may perform well in occupations where tasks involve checking or matching details. However, he made some errors in his interpretation and application of information during this evaluation, and he may sometimes become bogged down when presented with too many details. He may succeed most easily with specific training, frequent accuracy checks, and tasks that involve a limited number of items to be checked or matched.

6.     Mr. Larry presented with an unusual degree of vigilance and attention to legalistic matters and procedural details. The psychological basis of these behaviors is not entirely clear, though they may represent a goal-oriented strategy that is affected by problematic personality traits and/or residual post-traumatic effects. Regardless of its roots, this feature may present a significant obstacle to productive participation in services and to success in other aspect of occupational functioning.

7.     The evidence of possible personality disorder or disorders, and the nature of these possible conditions, raises some concerns in relation to Mr. Larry's likely responses to service providers and in relation to his stated occupational goals. He may have difficulty forming and maintaining working alliances, both in service settings and in occupational settings. He may have difficulty forming an accurate assessment of his own performance and may have difficulty accepting corrective feedback. He may reject professional recommendations and advice that is not in line with his own views. He may tend to remain vigilant and distrustful despite efforts by other people to provide support and understanding. He may perceive slights or insults that are not intended, and may be quick to find fault with others. He may have a strong need to achieve compliance from others, or to ensure that other people act according to his requirements and expectations. He may feel that his personal strengths entitle him to such compliance, and may respond with anger and retaliation if his expectations are not met or if he feel criticized or rejected.

8.     Objective observation of his actual performance and behavior, and reports from his supervisor and from others who are familiar with his performance and behavior in occupational settings, may be helpful in gaining further insight into his occupational functioning, strengths, and limitations.

9.     Mr. Larry's statements regarding his history, behavior, and performance should be verified when they are to be used in service planning.

(Schneider Decl. Ex. 8 at 12-13.)

Dr. Cogburn regularly performs psychological evaluations of Agency clients pursuant to case-by-case contracts with the Agency. (Cogburn Decl. ¶ 2.) She considers the Agency, not the individual, to be her client in this scenario. (Cogburn Dep. 13:22-24, 14:4-10.) In conducting the Evaluation, Dr. Cogburn performed her obligations pursuant to her contract with the Agency and offered her professional judgment. (Cogburn Decl. ¶¶ 8-9.) She did not discuss Larry with anyone at the Agency prior to completing the Evaluation. (Cogburn Dep. 109:1-11.)

Dr. Cogburn has performed between 1,000 to 2,000 psychological evaluations, but has likely evaluated less than one hundred black males. (Cogburn Dep. 11:16-20; 27:14-21.) She did not intend to cause Larry any harm or emotional distress. (Cogburn Decl. ¶¶ 8-9.)

Sometime in late September, 2014, Larry met with Dr. Cogburn to discuss the Evaluation. Schaffer and Duff also attended the meeting. The following case notes document Schaffer's memory of the meeting:

> Dr. Cogburn attempted to explain the procedure for the meeting. The client immediately argued with Dr. Cogburn about their discussion to meet alone to go over the evaluation and then to have a second meeting to include [Agency counselor]. Dr. Cogburn had no recollection of that discussion. The client insisted that he did make that request.

> The client also did not want to continue the discussion of his psychological evaluation without having an opportunity to read the document first. There was no request to do this before the meeting. The client emphasized that he was a "mature adult" who can understand reports, and is well aware of the DSM-V. Dr. Cogburn was concerned about his diagnosis, and that the report could be damaging to him without a debriefing.

> We discussed the reality of rescheduling a meeting at this point, because of the doctor's appointments as well as the [Agency counselor's] calendar. We were willing to check on everybody's calendars to find a date that would work.

Branch Manager Duff then spoke about the client's self-employment and that we would not be considering him for this avenue.   The client was offered the original IPE,[18] with job development services in the plan.

> The client stated that he does not want to pursue other employment at this time, and that "he knows what to do."

(Schneider Decl. Ex. 9.)  Larry's counselor, not Duff, made the decision Larry was not eligible for self-employment assistance.  (Duff Dep. dated January 18, 2018 ("Duff Dep.")[19] 17:14-24.)

In light of Larry's representation he was not interested in pursuing other employment, the Agency closed the Application on October 9, 2014.  (Schneider Decl. Ex. 9.)  Schaffer informed Larry of the closure by letter dated October 13, 2014, which read: "I am closing your file with the [Agency] because you stated in our meeting of 9/24/2014 that you do not want to pursue other employment at this time." (Schneider Decl. Ex. 10.)

In an October 24, 2014 letter to Schaffer, Duff, and Dr. Cogburn (the "Letter"), Larry challenged the veracity of Schaffer's statement, asserting everything in Schaffer's October 13, 2014 letter "is false, including the date of the meeting" and claimed Schaffer, Duff, and Dr. Cogburn acted "recklessly" and "in wanton disregard" of the special duty owed to all Agency participants.  (Lott Decl. Ex. 3 at 1-2.)  He stated the meeting, which he claim occurred on September 26, 2014, was to be just between him and Dr. Cogburn to discuss the results of the Evaluation and that the meeting would be recorded by both parties.  (Lott Decl. Ex. 3 at 1.)  Once the "debriefing" was concluded, Schaffer and Duff would be invited to participate in a second meeting.  (Lott Decl. Ex. 3 at 1.)  Larry claimed Dr. Cogburn remembered the agreement but acknowledged Schaffer denied knowledge of

---

[18]"IPE" stands for Individualized Plan for Employment.  (Lee Decl. ¶ 9.)

[19]The Duff Deposition is Exhibit 27 to the Schneider Declaration (ECF No. 105).

such request and claimed the request should have been in writing. (Lott Decl. Ex. 3 at 1.) Larry thought this agreement constituted a constructive revocation of the Consent. (Lott Decl. Ex. 3 at 1.)

In the Letter, Larry stated he requested a copy of the Evaluation and that the meeting be rescheduled to allow him time to review the Evaluation. (Lott Decl. Ex. 3 at 1-2.) In response, Schaffer expressed concern to Larry about the additional cost to have Dr. Cogburn return for a second meeting and Larry became upset his requests were being ignored. (Lott Decl. Ex. 3 at 2.) Larry noted that as he prepared to leave the meeting, Duff advised him the Agency would not support his request for self-employment assistance and that the decision had been made by Schaffer. (Lott Decl. Ex. 3 at 2.) Larry stated that in response to his request for an explanation, both oral and in writing, of the reason for the decision, Schaffer explained it was based on the information contained in his file and that no written decision existed. (Lott Decl. Ex. 3 at 2.) Larry admitted Schaffer then informed him "other services for employment would be made available to [him] if [he] wanted the services." (Lott Decl. Ex. 3 at 2.) In closing, Larry expressly requested "a written explanation of what information in my file led to my self-employment support through [the Agency] being terminated." (Lott Decl. Ex. 3 at 1.)

The Agency responded in its own letter dated November 14, 2014, offering the following detailed explanation of the reasons for the closure:

> On February 25, 2013, you were determined to be eligible for [Agency] services. [The Agency] must assess the vocational rehabilitation needs of an eligible client and make a determination about the employment outcome and the nature and scope of the services to be included in the client's Individualized Plan for Employment (IPE) based on existing data and, if necessary, a comprehensive assessment (additional evaluations) of the client. 34 CFR 361.45(a), (b), (f); 34 CFR 361.5 (b)(6)(ii). The client's employment outcome and the services provided must be consistent with the client's "unique strengths, resources, priorities, concerns, abilities, capabilities, interests and informed choice." 34 C.F.R. (B)(2); *see also* 34

CFR 361.5(b)(6)(ii), (16).

You have expressed an interest in pursuing a self-employment plan to be an Adult Care Home operator. As with any employment outcome, self-employment should be consistent with the client's "strengths, resources, priorities, concerns, abilities, capabilities and interests, providing the individual full opportunity to exercise informed choice in the selection of their employment outcome", which are identified in a comprehensive assessment. OAR 582-070-0041; OAR 582-070-0042; OAR 582-070-0043(1).

A comprehensive assessment in your case included a psychological evaluation by a qualified mental health professional, Dr. Robinann Cogburn. The evaluation identified concerns with your level of executive functioning, organizational and interpersonal skills. Dr. Cogburn indicated that you are better suited to employment with well-established procedures, consistent task demands, and well-defined, sequential work assignments. In contrast, you would have more difficulty with situations where you must respond to emerging problems and generate solutions on a fluid, situation-related basis. You would also have difficulty with dealing with multiple tasks at the same time, developing a plan to complete a large goal or project, organizing and coordinating elements, and prioritizing details. The evaluation also indicated that you would be unlikely to accept support or assistance to address these deficits and would have difficulty working with others. The ability to develop and implement a viable business plan and to follow through with that plan would be better suited to an individual who excels at problem solving, multi-tasking, planning and organizing, which are areas where the evaluator indicated you have difficulties in. In addition, as interpersonal skills are also a challenge for you, self-employment in a care-giving field is not consistent with your strengths and abilities. As a result, [the Agency] determined that self-employment was not an appropriate employment outcome in your IPE.

In addition, on September 24, 2014, you indicated that you did not want to participate in any further vocational rehabilitation services or program. You also indicated that you did not want to pursue an employment outcome other than self-employment. Consequently, [the Agency] closed your file on October 09, 2014[,] pursuant to OAR 582-060-0020(1)(a)(H).

(Schneider Decl. Ex. 11.)

Larry filed a Request for Impartial Fair Hearing on December 12, 2014, claiming Schaffer, Duff, and Dr. Cogburn conspired to falsify records which resulted in the Agency terminating his Application in bad faith and seeking approval to pursue self-employment. (Schneider Decl. Ex. 12.)

The parties agreed to reopen the Application, assign Larry a new counselor, namely Sadruddin, and develop a new plan for long-term employment. (Schneider Decl. Exs. 13, 16.) Larry withdrew his hearing request on February 4, 2015. (Schneider Decl. Ex. 14.)

In their initial meeting, Larry told Sadruddin he did not think the Agency properly addressed his goal of self-employment and requested an opportunity to further explore his plan to open an adult care home. (Schneider Decl. Ex. 16.) They discussed what was needed to support a case for self-employment assistance and agreed to exchange documents and information. (Schneider Decl. Ex. 16.)[20]

On September 1, 2015, Shawn Winkler-Rios ("Winkler-Rios") forwarded a thirty-six page feasibility study addressing Larry's proposal to open an adult care home providing specialized services to intellectual and developmental disability clients (the "Study") to Sadruddin and Larry. (Schneider Decl. Ex. 18.) The Study discussed the feasibility of Larry's proposal in detail, considering Larry's ability to successfully open and manage an adult care home, as well as the market and financial feasibility of the proposal, and made recommendations to the Agency with regard to Larry's proposal. (Schneider Decl. Ex. 4.)

The Study summarized Larry's education, employment, and volunteer history; Larry's industry and business experience; eligibility requirements for operating an adult care home; and how the business could accommodate Larry's disabilities. (Schneider Decl. Ex. 18 at 7-13.) Winkler-Rios provided the following conclusion relative to Larry's readiness:

---

[20]On April 22, 2015, Larry filed a second Request for Impartial Fair Hearing complaining Dr. Cogburn had not provided information requested by him and disagreeing with a decision made by Kailana Pilmauna, Assistant Attorney General. (Schneider Decl. Ex. 17.) There is no evidence establishing how this request was resolved.

Starting and operating an Adult Care Home requires business skills as well as case management skills. Clients with intellectual and developmental disabilities will require a comprehensive array of services and significant case management skills. Mr. Larry's physical limitations occurred [due] to a car accident in 2009 and he has since been engaging in physical rehabilitation that now allows him to engage in the business. He has been preparing for the last five years to perform this kind of work with IDD clients through apprenticeships and required training. Mr. Larry has provided information demonstrating he is progressing to meet the eligibility requirements of an Adult Care Home. All of this provides good evidence of the client's motivation to engage int he business. **It should be noted that several of the eligibility requirements for participation in the Multnomah County Program are in progress and have not been met at this time.**

(Schneider Decl. Ex. 18 at 13.) Winkler-Rios thought an adult care home participating in the Multnomah County program appeared feasible but noted the industry is highly regulated and operating a home requires training and certifications, only some of which Larry had completed or obtained. (Schneider Decl. Ex. 18 at 33.) The Study estimated initial start-up costs for an adult care home would range from $10,000 to $20,000, with additional expenses to acquire and operate a residence within which the home would be located, and Multnomah County required savings equal to two months of operating expenses. (Schneider Decl. Ex. 18 at 35.) Winkler-Rios recommended the Agency authorize preparation of a business plan with the following conditions:

1.  Locate a prospective property that can be used as an Adult Care Home (meeting all legal requirements).

2.  Secure funding sources that can be used for startup costs PLUS two months of operating expenses before business plan approval.

3.  Meet all Multnomah County Eligibility requirements (at a minimum) to participate in the program. These requirements should be completed, to the extent reasonable, before [Agency] support is provided.

(Schneider Decl. Ex. 18 at 1, 37.)

At the Agency's request and the direction of defendant Costello, Dr. Ude reviewed, compared, and contrasted the psychological evaluations of Larry conducted by Dr. Ethel-King and Dr. Cogburn, and set forth her findings in two-page report dated October 1, 2015. (Ude Decl. dated April 11, 2018, ECF No. 108, ¶¶ 4-5.) Dr. Ude served as a consultant for the Agency for more than thirty-five years, and conducted thousands of records reviews for the Agency during this period, a service commonly performed by licensed healthcare professionals. (Ude Decl. ¶¶ 2-3, 9-10.) Dr. Ude has also completed thousands of psychological evaluations herself. (Ude Dep. dated March 14, 2018,[21] 18:4-12.)

Dr. Ude's role as a consultant is limited to a review of a case files; she does not engage in independent fact finding or research. (Ude Dep. 14:15-21.) In reviewing Larry's file, Dr. Ude would have reviewed any release form and correspondence relating to the release in the file. (Ude Dep. 35:13-20.) Dr. Ude did not remember seeing any correspondence in the file from Larry withdrawing or revoking permission to share information. (Ude Dep. 35:36:5-10.) Dr. Ude did not meet or have any communications with Larry at the time of her review and did not discuss Larry with anyone at the Agency between the time of the review and the time Larry filed this lawsuit. (Ude Decl. ¶¶ 6, 10.) She did not intend to cause Larry mental or emotional distress, and had no reason to believe Larry would suffer any emotional distress, as a result of her routine record review. (Ude Decl. ¶¶ 11, 12.)

Larry sought psychiatric counseling from Dr. Lott in February 2016 to help him cope with the stress he was feeling as a result of the Agency's actions. (Lott Decl. 3, 7.) Dr. Lott diagnosed

---

[21]Portions of the Ude Deposition are found at Exhibit 25 to the Schneider Declaration (ECF No. 105) and Exhibit 3 to the Madigan Declaration (ECF No. 109).

Larry with depression and post-traumatic stress disorder, noting this diagnosis was consistent with those of the two other Black psychologists who had previously evaluated and/or treated Larry. (Lott Decl. ¶ 6, Ex. 1A.) He did not believe Larry was a danger to himself or others and did see any indications that Larry was prejudiced toward women who were not African American. (Lott Decl. ¶¶ 9, 11.)

Larry complained to Dr. Lott about Dr. Cogburn's conduct, reporting "she did not treat him with the same level of care and concern required by her role as an evaluator due to the fact that Dr. Cogburn was contracted with the [Agency]." (Lott Decl. ¶ 8.) Dr. Lott requested a complete copy of Larry's file from Dr. Cogburn but initially received only a portion of the records. (Lott Decl. ¶ 4.) Dr. Cogburn sent the remainder of the file in response to a second request, explaining to Dr. Lott she had recently discovered a previously misplaced portion of Larry's file. (Lott Decl. ¶ 4.) Larry claimed a drawing found in the second phase of produced records was not his because it did not contain his initials. (Lott Decl. ¶ 5.) Larry told Dr. Lott he did not trust Dr. Cogburn and "felt like she had manipulated his file to achieve the outcome [Agency] staff wanted." (Lott Decl. ¶ 5.)

Dr. Lott opined Dr. Cogburn "did not provide appropriate information following her evaluation about results and conclusions and nature of services rendered." (Lott Decl. ¶ 8.) He also referenced the review of Dr. Cogburn's report diagnosis by Dr. Ude, which he described as raising concerns for portions of Dr. Cogburn's analysis. (Lott Decl. ¶ 10.) Dr. Lott criticized Dr. Ude for endorsing the evaluation rather than requiring Dr. Cogburn to correct the areas of concern. (Lott Decl. ¶ 10.) Also, after hearing from Larry that various defendants had published confidential documents, including the Evaluation, to the internet by filing them in this lawsuit, Dr. Lott reported such publication was a breach of the Health Insurance Portability and Accountability Act and caused

Larry to suffer a great deal of emotional distress. (Lott Decl. ¶ 12.)

Larry filed a tort claim notice on March 23, 2016, alleging the Department, the Agency, the "DOJ," and "Various State employees and administrators as named in DRN 15-16[22] – and more to come," engaged in race and disability discrimination from January 2013 to present (the "Notice"). (Schneider Decl. Ex. 22.) Dr. Cogburn was not served with the Notice. (Cogburn Decl. ¶ 10.) The Agency subsequently closed the Application on June 22, 2016, after Larry ignored a letter from the Agency dated June 9, 2016, advising him failure to notify the Agency he was interested in pursuing Agency services by June 20, 2016, would result in such closure. (Schneider Decl. Ex. 21.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2018). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary

---

[22]Larry apparently filed a third Request for Impartial Hearing in late 2015 which was identified as DRN 15-16. This request is not part of the record. However, a February 9, 2016 ruling by a hearings officer granting the Agency's motion to dismiss Larry's hearing request on several issues but offering Larry "the opportunity to present evidence to support his [remaining] claims at a fair and impartial hearing" is in the record. (Schneider Decl. Ex. 19 at 3.) Larry withdrew his hearing request on May 23, 2016, claiming the impartial hearing process to be "greatly flawed" and informing the Agency he would pursue his grievance in a different, more equitable, forum. (Schneider Decl. Ex. 20.)

judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2018). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I. First and Second Claims for Relief - 29 U.S.C. § 794

Larry's First and Second Claims for Relief allege the State, the Department, the Agency, and Trina Lee, Director of the Department (collectively the "State Defendants"), discriminated against

Larry by "failing to provide a reasonable accommodation for his disability" and "in the terms, conditions, and privilege[] of employment against [Larry] because of his disability" in violation of 29 U.S.C. § 794. (First Am . Compl., ECF No. 41, ¶¶ 57, 61.) Larry testified at his deposition the accommodations he sought were Agency services, such as retraining and self-employment assistance, and he was denied these accommodations based on the Evaluation, and Dr. Cogburn's conclusions and recommendations found therein. (Larry Dep. 30:20-32:23.)

The State Defendants move for summary judgment on these claims relying on the one-year statute of limitations found in OR. REV. STAT. § 659A.875. Alternatively, the State Defendants argue Larry has failed to offer evidence required to support a claim of discrimination under the Act.

A. *Statute of Limitations*

The Act does not provide a statute of limitations governing alleged violations of the Act. "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985), *superceded by statute as stated in Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). This district considers the Oregon Rehabilitation Act (the "Oregon Act") to be the state law most analogous to claims brought under the Act. *Savona v. Southern Oregon Univ.*, Civ. No. 1:17-CV-01604-AA, 2018 WL 1547843, at *2 (D. Or. March 29, 2018) ("The Oregon analog to the ADA and the Rehabilitation Act is contained in the Oregon Rehabilitation Act, ORS 659A.103 to 659A.145.")

The Oregon Act contains the one-year statute of limitations relied on by the State Defendants. However, the language of this provision applies only to civil actions alleging "an unlawful employment practice." OR. REV. STAT. § 659A.875 (2018). This district applied this one-year

limitation to an action initiated by an employee alleging disability discrimination against his former employer. *Clink v. Oregon Health & Science Univ.*, 9 F. Supp. 3d 1162 (2014). However, it subsequently found "[t]he statute of limitations set out in ORS 659A.875 applies specifically to disability discrimination claims in the employment context," thereby limiting the one-year limitation to actions by an employee against his employer. *Savona*, 2018 WL 1547843, at *4.

Larry does not allege he was employed by the State Defendants or that they discriminated against him with regard to existing or future employment with the State Defendants. Rather, Larry alleges the State Defendants discriminated against him by denying his request for assistance in obtaining his desired goal of self-employment.

When a claim alleging violation of the Act is based on disability discrimination with regard to services from a state or county program, this district has applied the two-year statute of limitations for tort actions found in OR. REV. STAT. § 12.110(1). *Savona*, 2018 WL 1547843, at *4 (public university's failure to provide requested accommodations for required class subject to two-year statute of limitation ); *Updike v. Clackamas County*, 3:15-cv-00723-SI, 2015 WL 7722410, at *5-*6 (D. Or. Nov. 30, 2015)(two-year limitation period applied to disability discrimination "in a context related to provision of services, programs, and activities rather than employment"); *T. L. ex rel. Lowry v. Sherwood Charter School*, No. 03:13-CV-01562-HZ, 2014 WL 897123, at *9 (D. Or. March 6, 2014)(court found two-year limitation period governed allegations that public entity deprived plaintiff of services or programs because of his disability). In accordance with these case, the court finds the two-year statute of limitations found in OR. REV. STAT. § 12.110(1) governs Larry's claims.

"The statute of limitations begins to run when a potential plaintiff knows or has reason to

know of the asserted injury." *De Anza Properties X, Ltd. v. County of Santa Cruz,* 936 F.2d 1084, 1086 (9th Cir. 1991). Larry has presented evidence Duff informed him he would not be receiving self-employment assistance on September 26, 2014. As Larry filed this lawsuit on September 26, 2016, his claims for disability discrimination in violation of 29 U.S.C. § 794 based on the State Defendants' denial of these benefits is timely. Moreover, Larry expressly limits his claims to "events occurring on September 26, 2014 and ongoing" in the First Amended Complaint filed April 14, 2017 (the "Complaint"). (First Am. Compl. ¶ 1.) Consequently, any conduct of the State Defendants prior to September 26, 2014, is not actionable.

### B. Prima Facie Case

Larry alleges the State Defendants violated 29 U.S.C. § 794, which provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (2018). "A plaintiff bringing suit under [29 U.S.C. § 794] must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Where, as here, the plaintiff seeks compensatory damages for violations of 29 U.S.C. § 794, the plaintiff must also "prove intentional discrimination on the part of the defendant." *Id*. at 1138.

The State Defendants concede the Agency is a program that receives federal assistance but argue Larry is unable to prove the other three elements necessary for his First and Second Claims for Relief.[23] Neither party addresses the intentional discrimination requirement.

### 1. Individual with a Disability

29 U.S.C. § 794 incorporates the definition for "individual with a disability" found in 29 U.S.C. § 705(20), which provides, in pertinent part:

the term "individual with disability" means any individual who –

> (i) has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment; and

> (ii) can benefit in terms of an employment outcome from vocational rehabilitation services provided pursuant to title I, III, or VI [19 U.S.C. §§ 720 *et seq.*, 771 *et seq.*, or 795 *et seq.*].

29 U.S.C. § 705(20)(1) (2018). Oregon law provides an applicant may be eligible for vocational rehabilitation services if the Agency determines the applicant: (1) "has a physical or mental impairment;" (2) that "constitutes or results in a substantial impediment to employment for the applicant;" and (3) which "requires vocational rehabilitation services to prepare for, secure, retain, or regain employment consistent with the applicant's unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice." OR. ADMIN. R. 582-050-0020(1)-(3) (2018). If the first two requirements are met, the regulation creates a rebuttable presumption the applicant can benefit in terms of an employment outcome from vocational rehabilitation services,

---

[23]The State Defendants treat Larry's claims for violation of 29 U.S.C. § 794 as two unique claims subject to different analysis (accommodation claim and disparate treatment claim). However, Larry claims the State Defendants violated 29 U.S.C. § 794 by denying his request for self-employment assistance, which he identified as the requested accommodation or benefit sought. The claims are virtually identical, are subject to analysis under the same standard, and will be addressed together.

which satisfies a fourth requirement.  OR. ADMIN. R. 582-050-0020(5) (2018).

Larry sought assistance from the Agency in 2013, alleging disability due to major depressive order, post traumatic stress disorder, and a shoulder and back injury.  The Agency assigned Larry a counselor, with whom he discussed his goals and from whom he received "homework."   A physical capacity evaluation revealed Larry was limited to work in the medium range of physical demand, and the Evaluation determined Larry suffered from partially resolved post traumatic stress disorder as well as mild neurocognitive disorder with deficits in executive functions and obsessive-compulsive disorder (provisional).  Additionally, the Agency requested a feasibility report for Larry's expressed desire to open an adult care home.   The Authorization Register offered by the Agency establishes the Agency spent more than $7,500 from January 8, 2013, to October 26, 2015, providing vocational services to Larry.  (Schneider Decl. Ex. 5.)

The Agency confirmed and defined limitations resulting from Larry's alleged disabilities, and provided substantial vocational services to Larry to assist him in obtaining employment.   It is unlikely the Agency would have decided to support Larry in this manner if he did not have a condition that resulted in a substantial impairment to employment and would not benefit from Agency services.  In fact, the Agency determined Larry was eligible for Agency services on February 25, 2013.  Viewing this evidence in a light most favorable to Larry, the court finds a genuine issue fact exists with regard to Larry's status as an "individual with a disability" for the purposes of 29 U.S.C. § 794.

### 2. Otherwise Qualified to Receive Benefits

A handicapped person is "otherwise qualified" if he "is able to meet all of a program's requirements in spite of his handicap." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979).  Under

Oregon law, a handicapped person, or an individual with a disability, is eligible for Agency services only when the Agency determines "the applicant requires vocational rehabilitation services to prepare for, secure, retain, or regain employment consistent with the applicant's unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice." OR. ADMIN. R. 582-050-0020(3) (2018).

Shortly after applying for Agency services, Larry identified self-employment as the owner of an adult care home as his desired employment outcome. At the time of the Application, Larry was employed part-time as a care giver at an adult care home and was clearly physically capable of performing these tasks. However, Dr. Cogburn noted in the Evaluation that Larry's personality traits "may present a significant obstacle to productive participation in services and to success in other aspects of occupational functioning" and "evidence of possible personality disorder or disorders, and the nature of these possible conditions, raises some concerns in relation to Mr. Larry's likely responses to service providers and in relation to his stated occupational goals." (Schneider Decl. Ex. 8 at 14.) Based on the Evaluation, the Agency determined Larry would likely not be successful in owning and managing an adult care home due to psychological challenges and that "self-employment was not an appropriate outcome" in Larry's individual employment plan. As Larry would not reasonably be expected to benefit from vocational rehabilitation services geared toward self-employment, specifically as an owner and manager of an adult care home, he was not "otherwise qualified" to receive these specific services.

Larry asserts the Evaluation was "fraught with errors" and offers Dr. Lott's testimony in support of this assertion. However, Dr. Lott does not attack Dr. Cogburn's recommendations as set forth in the Evaluation in any way. In his declaration, Dr. Lott notes Dr. Cogburn did not

immediately provide the entirety of Larry's file and the file provided contained a drawing which Larry did not recognize. Dr. Lott impliedly disagreed with Dr. Cogburn's diagnosis, finding Larry suffered from both post traumatic stress disorder and depression, but did not opine on Larry's ability or qualifications with regard to owning or managing an adult care home. While Dr. Lott complained that "Dr. Cogburn did not provide appropriate information following her evaluation about results and conclusions and nature of services rendered," he did not offer an opinion on the substance of such "results and conclusions." (Lott. Decl. ¶8.) Additionally, while he was unhappy that Dr. Ude did not bring her concerns about parts of Dr. Cogburn's findings to the Agency's attention, he also acknowledged Dr. Ude ultimately endorsed the Evaluation. Larry has failed to present evidence to controvert the Agency's determination that self-employment in a care-giving field was not consistent with Larry's strengths and abilities, and that his personality traits disqualified him from receiving the desired self-employment assistance.

Larry also contends the Agency relied solely on the Evaluation, and did not consider other information, such as his extensive work history of self-employed positions as well as his work with developmentally-delayed persons, which clearly establish his ability to own and manage an adult care home. The evidence makes clear Schaffer, who made the decision to remove self-employment assistance from Larry's individual employment plan, had been meeting with Larry for more than a year and was aware of Larry's employment history at the time she made her decision. Additionally, Dr. Cogburn explained that every evaluation she performs covers a range of topics, including social and developmental, criminal, drug and alcohol history, employment and employment goals, and

physical and mental health.[24]  (Cogburn Dep. 13:5-21.)  Dr. Cogburn included an extensive summary

of Larry's social and employment history in the Evaluation, specifically mentioning Larry's work

in a group home for adults with developmental disabilities, and his experience as the owner and

operator of a liquor store.   While neither Schaffer nor Dr. Cogburn specifically mentioned Larry's

work history in their respective decisions or recommendations, it is clear they were well aware of

such history at the time the decisions and recommendations were made.[25]

In a strikingly similar unreported case, the Ninth Circuit upheld a determination the plaintiff

was not "otherwise qualified" for the vocational rehabilitation service requested.   *German v. Div.

of Vocational Rehab., Dept. of Social Health Servs., Tacoma Office, State of Washington*, 857 F.2d

1477 (9th Cir. 1988).  German, a college professor of American History who had been involuntarily

hospitalized and was receiving Social Security benefits based upon a mental disability, applied for

vocational rehabilitation services seeking to attend law school.  *Id*. at *2.  Defendant considered

psychiatric opinions offered by various professional evaluations, as well as German's personality,

demeanor in interviews, and past education, and determined German was not an "otherwise qualified

handicapped individual" and "would not reasonably be expected to benefit by further university

education in terms of employability."  *Id*. at *2-*3.  The court rejected German's argument that his

research, publications, and papers, and experience as a *pro se in forma pauperis* civil litigant

---

[24]Similarly, Dr. Ude stated she considers an applicant's entire file when compiling a
psychological evaluation.  (Ude Dep. 18:14-24.)

[25]Larry also argues Dr. Cogburn should not have submitted the Evaluation to the Agency
without his approval so any decision made by the Agency based on the Evaluation was not properly
supported.   Larry signed the Consent, which expressly authorized Dr. Cogburn to provide the
Evaluation to the Agency, defeating Larry's claim Dr. Cogburn erred when supplying the Evaluation
to Schaffer.

established he was "otherwise qualified," finding such "self-serving evidence does not controvert the professional medical evidence offered by [defendant]." *Id*. at *3.

Larry has failed to offer evidence challenging or rebutting the evidence relied on by the State Defendants' in determining Larry was not "otherwise qualified" to receive services relating to self-employment. Consequently, the court finds Larry has failed to meet his burden to establish he was otherwise qualified to receive those services.

### 3. Denied Benefits Solely due to Disability

At the outset, the court is not convinced Larry was denied Agency services. While Duff informed Larry on September 26, 2014, the Agency would not support his request for self-employment assistance, she offered to continue to provide other Agency services, which services Larry rejected. The Agency formally closed Larry's file the following month in response to Larry's statement he did not want to pursue other employment. Based on this evidence, the Agency did not deny Larry Agency services. Rather, Larry opted not to receive the services offered. A vocational rehabilitation client does not have the right to choose the appropriate rehabilitation goal. Rather, "the rehabilitation counselor must make the final decision on eligibility and the scope of services provided." *Yochim v. Gargano*, 882 F. Supp. 2d 1068, 1079 (S. D. Ind. 2012)(quoting *Buchanan v. Ives*, 793 F. Supp. 361, 366 (D. Me. 1991)).

Moreover, the Agency reopened the Application in early 2015, and continued to work with Larry on his self-employment goal of opening an adult care home, including the preparation of an extensive feasibility study by Winkler-Rios. The Agency closed Larry's file again in June 22, 2016, when Larry failed to respond to a letter informing him he needed to communicate with the Agency if he was interested in continuing to receive Agency services. Once more, Larry's file was closed

based on Larry's failure to pursue the benefits offered, even though the Agency was providing services furthering his goal of self-employment at that time.

Even assuming the Agency denied Larry the benefits he sought, his complaint and testimony clearly establish both his disabilities and his race contributed to the Agency's decision to deny his request for benefits. Larry alleges in the Complaint he was "discriminated against on the basis of [his] disabilities and race." (First Am. Compl. at 1.) Larry similarly testified at his deposition he was discriminated against based on his disability and race. (Larry Dep. 33:25-34:6.) When asked to take race out of the equation and concentrate on "what disability is it that you think caused them to discriminate against you," Larry responded: "All of it, I mean, every disability that I had. And you are separating the race from the disabilities, I am not. I can't separate the race from the disabilities after the type of treatment that I have had, okay. I know how white people treat black folks." (Larry Dep. 70:3-18.)

The express language of 29 U.S.C. § 794 limits actionable discrimination to that based solely on the plaintiff's disability. Where a plaintiff maintains discrimination resulted in part from something other than a disability, such discrimination is not action under 29 U.S.C. § 794. *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992). It is clear Larry asserts the State Defendants discriminated against by denying him benefits based both on his disability and his race, and that such discrimination is not distinguishable. Consequently, Larry fails to prove, or even allege, he was denied benefits solely because of his disability.

4. Intentional Discrimination

Where, as here, a plaintiff seeks compensatory damages for violation of 29 U.S.C. § 794, the plaintiff must prove the defendant engage in intentional discrimination. The Ninth Circuit has

determined the deliberate indifference standard applies in this context. *Duvall*, 260 F.3d at 1138. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id*. at 1139. When a public entity receives a request for accommodation, it is required to engage in a fact-specific investigation and consider the particular individual's needs when determining what constitutes a reasonable accommodation. *Id*. To constitute intentional discrimination, an agency's failure to act in this manner must be based on more than negligent conduct – it must involve an element of deliberateness. *Id*.

Larry alleges the State Defendants acted with malice in denying his request for services to further his goal of self-employment, but fails to offer any evidence in support of this allegation. Even assuming the State Defendants were aware failure to provide the specific services requested by Larry was substantially likely to harm a federally-protected right, the evidence establishes the decision not to provide self-employment assistance was based on a fact-specific investigation in which Larry's particular needs and disabilities were considered. Consequently, the State Defendants did not act with deliberate indifference or intentionally discriminate against Larry by denying his request for self-employment assistance.

### 5. New Allegations

At his deposition, Larry described additional conduct in support of his claims under the Act. Specifically, Larry identified additional accommodations he requested and, apparently, was denied. For example, he claimed he requested a pain-reducing device for his shoulder, and services from Mercy Corp. and an on-line imaging company as accommodations. (Larry Dep. 32:11-23.) Additionally, Larry claimed the handling of the Evaluation and other records violated the Act. For

example, Larry asserted Costello's provision of the Evaluation to Dr. Ude, defendant Mark Masthoff's ("Masthoff") alleged direction to Dr. Ude to not provide documentation requested by Larry and his representation to Larry that no such documents existed, and Dr. Ude's failure to maintain her records all violated the Act. (Larry Dep. 47:10-23, 55:1-14, 56:16-23.) Larry also claimed Dr. Ude violated the Act by failing to engage in adequate "due diligence" and relying solely on the inadequate Evaluation when offering her opinion regarding Larry's bias against white female employers. (Larry Dep. 58:1-59:18.) Finally, Larry claimed Agency employees were not qualified to perform the responsibilities of their respective positions and such lack of qualification violated the Act. (Larry Dep. 60:1-10.)

First, Larry failed to allege these facts in the Complaint and his reliance on them for the first time at the summary judgment stage is untimely. Second, with regard to the requested accommodations, Larry does not identify when those accommodations were requested or denied, and he does not provide any documentation on why the accommodations were denied. Third, Larry fails to identify any provision of the Act which governs the handling of client records. Finally, even assuming Larry has alleged claims based on these facts, such claims are defeated by his failure to establish he was otherwise qualified to receive benefits, denied benefits solely because of his disability, or was intentionally discriminated against.

*C. Conclusion*

The two-year statute of limitations found in OR. REV. STAT. § 12.110(1) governs Larry's claims for violation of the Act. Larry has failed to offer evidence creating a genuine issue of material fact with regard to three of the five elements of a claim for disability discrimination under 29 U.S.C. § 794. Specifically, the evidence, when viewed in a light most favorable to Larry, establishes Larry

was not otherwise qualified to receive the self-employment services he requested; was not denied such services based solely on his disability, and was not subject to intentional discrimination. The State Defendants are entitled to summary judgment on Larry's first two claims for relief.

<u>III.  Third and Fourth Claims for Relief - Common Law Claims</u>

In his Third Claim for Relief, Larry alleges Costello, Duff, Schaffer, Sadruddin, Mastoff (collectively, the "Individual Defendants"), Dr. Cogburn, and Dr. Ude acted outside of their employment with the intent to inflict emotional distress on Larry. The Fourth Claim for Relief seeks to hold the State Defendants vicariously liable for the actions of all other defendants committed within the scope of their employment.

The Individual Defendants, State Defendants and Dr. Cogburn assert arguments based on Larry's notice, or lack thereof, under the Oregon Tort Claims Act ("OTCA"). The Individual Defendants, Dr. Cogburn, and Dr. Ude (collectively the "IIED Defendants") also move for summary judgment on the merits of the intentional infliction of emotional distress claim, contending Larry fails to present evidence of the requisite elements of the claim. Dr. Cogburn further argues to the extent Larry's claim against her is based on statements to the Agency, she is protected by a qualified privilege. Finally, the State Defendants seek summary judgment on the vicarious liability claim, asserting Dr. Cogburn was an independent contractor and Larry has failed to establish any defendant acted negligently.

*A.  Oregon Tort Claim Notice*

The OTCA requires that individuals seeking to bring suit against the State, or an officer, employee, or agent of the State, provide the State with notice of that claim "within 180 days of the alleged loss or injury." OR. REV. STAT. 30.275(2)(b), (5)(a) (2018). "Failure to give timely notice

of a claim is fatal to a plaintiff's tort claim against a public body." *Denucci v. Henningsen,* 248 Or. App. 59, 66 (2012). Further, "[t]he pleading and proof of notice sufficient to satisfy the requirements of ORS 30.275 is a mandatory requirement and a condition precedent to recovery under the [OTCA]. *Urban Renewal Agency of City of Coos Bay v. Lackey*, 275 Or. 35, 40 (1976).

The notice required by the OTCA may be formal, actual, or by commencement of action. OR. REV. STAT. 30.275(3) ( 2018). Formal notice is a written statement giving notice of a claim, describing its time, place, and circumstances, and stating the claimant's name and mailing address. OR. REV. STAT. 30.275(4) (2018). Actual notice occurs when the "time, place, and circumstances giving rise to the claim" are communicated to the State in such a way that a "reasonable person would conclude that a particular person intends to assert a claim . . . ." OR. REV. STAT. 30.275(6) (2018). Actual notice "need not specify precisely *what* claim[]" the claimant intends to bring, but must at least "warn of the plaintiff's intent to bring '*a* claim[.]'" *Flug v. University of Oregon*, 335 Or. 540, 554 (2003) (emphasis in original). Commencement of an action within the above-stated time frame also suffices as notice for purposes of the OTCA. OR. REV. STAT. 30.275(3)(c).

Under the OTCA, the state is "subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties . . . ." OR. REV. STAT. 30.265(1) (2018). Thus, where a state employee acts outside the scope of his or her employment, the state is not liable and a tort claim notice is not required prior to initiating a civil action. *See Berry v. State of Oregon*, 141 Or. App. 225, 229 (1996) ("a plaintiff does not need to give the state notice of claim under ORS 30.275 in order to sue a state employee for an individual tort."). As such, the court must analyze whether the alleged conduct falls within the scope of the employee's official duties.

It is evident Larry's vicarious liability claim against the State Defendants is limited to actions taken within the scope of their employment and is covered by the OTCA. On the other hand, Larry generally alleges the IIED Defendants are being sued in their "individual and official capacity," but he expressly alleges the IIED Defendants "individually and collectively acted outside the scope of their employment" in his claim for intentional infliction of emotional distress. (First Am. Compl. ¶¶ 8-14, 67.) As a result, it is not entirely clear from the allegations of the Complaint that notice was required under the OTCA for Larry's claim for intentional infliction of emotion distress. When the scope of a defendant's employment is relevant to an OTCA inquiry, it may be decided upon summary judgment if there is no genuine issue of material fact as to whether the alleged conduct fell within that scope, i.e., "where only one reasonable conclusion can be drawn from the facts." *Stanfield v. Laccoarce*, 284 Or. 651, 655 (1978).

In *Stanfield*, the Oregon Supreme Court articulated three factors with which to evaluate whether conduct is within the scope of employment:

> In deciding whether an employee was acting within the scope of his employment, the factors to be considered are whether the act in question is of a kind the employee was hired to perform, whether the act occurred substantially within the authorized limits of time and space, and whether the employee was motivated, at least in part, by a purpose to serve the employer.

*Id.* The Oregon Supreme Court has characterized these three elements as "requirements," all of which must be met to demonstrate conduct within the scope of employment. *Lourim v. Swensen*, 147 Or. App. 425, 433 (1997) (citing *Chesterman v. Barmon*, 305 Or. 439, 442 (1988)).

The IIED Defendants were hired or contracted by the Agency to perform the acts alleged by Larry. There is no evidence any of these acts occurred outside the authorized limits of their employment or contract. Finally, all of the actions were taken with the purpose of determining

Larry's right to Agency services and, consequently, motivated by a purpose to serve the employer. The court finds the IIED Defendants acted within the scope of their employment with the State for the purposes of the OTCA[26] and the State was entitled to notice of Larry's intentional infliction of emotional distress claim in accordance with the OTCA.[27]

The State acknowledges receiving proper notice of Larry's intent to sue on a form dated March 23, 2016. (Schneider Decl. Ex. 22) Based on this notice, the State Defendants and IIED Defendants concede Larry may rely on conduct occurring within 180 days of March 23, 2016, or September 25, 2015, in support of his common law claims.

Larry contends the Letter constitutes actual notice under the OTCA. Actual notice must be provided to the individual responsible for administering tort claims, which is the Director of the Oregon Department of Administrative Services for state employees or agents. OR. REV. STAT. 30.275(5),(6). The Letter was not addressed to the proper individual and Larry has not offered evidence such individual received the notice. Additionally, actual notice must provide information regarding the time, place, and circumstances giving rise to the claim and communicate the intent to assert a claim against the public body, or an officer, employee or agent of the public body. OR. REV. STAT. 30.275(6). In the Complaint, Larry alleges the Letter informed Schaffer, Duff, and Dr. Cogburn of their tortious acts, Larry's disagreement with the closing of his file, and a request for a written explanation for why his file was closed. (First Am. Compl. ¶ 52.) This summary, and a

---

[26]While the State Defendants and Dr. Cogburn argue Dr. Cogburn was an independent contractor for purposes of vicarious liability, they appear to concede she was an agency of the State for purposes of OTCA notice.

[27]Larry does not argue the OTCA does not apply to his both of his state law claims, but only the timing of when OTCA notice was given. In so doing, he apparently concedes his intentional infliction of emotional distress claim is governed by the OTCA.

review of the Letter, make clear Larry did not provide information regarding the time, place, and circumstances giving rise to his common law claims, nor did he communicate an intent to assert such claims.

Larry has asserted a claim against the State Defendants and IIED Defendants for actions taken in the scope of their employment. Accordingly, Larry has the burden of proving he provided notice under the OTCA with regard to his claim. The Letter did not provide adequate notice under the OTCA. Larry did provide proper notice on March 23, 2016, allowing Larry to recover only for losses or injuries occurring on or after September 24, 2015.

### B. Intentional Infliction of Emotional Distress

Under Oregon law, a claim for intentional infliction of emotional distress only lies where the defendant intended to inflict severe emotional distress on the plaintiff, the defendant's acts were the cause of severe emotional distress, and the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 203 (1991), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532 (1995)(*citing Sheets v. Knight*, 308 Or. 220, 236 (1989)). It is the defendant's acts, rather than their motives, that must be outrageous. *Id*. at 204. The IIED Defendants move for summary judgment on Larry's intentional infliction of emotional distress claim arguing he failed to offer evidence they acted with the requisite intent or that their acts were extraordinary transgressions of the bounds of socially tolerable conduct.[28]

---

[28]Dr. Ude also asserts Larry has not established her actions caused him severe emotional distress. As the court finds Larry fails with regard to the first and third element of an intentional infliction of emotion distress claim, the court will not address Dr. Ude's argument on the second element.

1. Intent

The Oregon courts have limited "intent" to include only those situations where the defendant "'desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.'" *McGanty v. Staudenraus*, 321 Or. 532, 550 (1995)(quoting Restatement (Second) of Torts, § 46, comment i (1965)). Larry has failed to present evidence the IIED Defendants acted for the purpose of causing him to suffer severe emotional distress.

Larry does not identify any offensive conduct occurring after September 24, 2015, in the Complaint. The evidence reveals that only Dr. Ude's review of the Evaluation and subsequent report and Dr. Cogburn's failure to provide Larry's entire file to Dr. Lott occurred after that date. Larry also identified conduct which could have occurred after September 24, 2015, in his deposition, specifically Costello's provision of the Evaluation to Dr. Ude, Masthoff's alleged direction to Dr. Ude to not provide documentation requested by Larry and his representation to Larry that no such documents existed, and Dr. Ude's failure to maintain her records. Finally, in his declaration Larry offers defendants' filing of confidential material in support of their summary judgment motions despite the existence of a protective order as additional support for his claim for intentional infliction of emotional distress in his declaration. (Larry Decl. ¶ 5.)[29]

Even assuming these actions are properly before the court, Larry has failed to offer any evidence this conduct was intended to inflict severe emotional distress on Larry. To the contrary,

---

[29]Larry also asserts in his opposition briefing that the Agency's continued reliance on the Evaluation, which remained in his file, is actionable. Larry does not present any evidence supporting this assertion. Moreover, as of September 1, 2015, Winkler-Ross was preparing a feasibility study for an adult care home, establishing the Agency was providing self-employment assistance as of this date, negating any detrimental effects from the presence of the Evaluation in Larry's file.

both Dr. Cogburn and Dr. Ude represented they did not desire or intend to cause Larry any mental or emotional distress. Moreover, there is no evidence the IIED Defendants were aware the conduct identified was substantially certain to cause Larry severe emotional distress. Finally, with regard to confidential material filed in this action, Larry has filed to identify the documents filed which contain the confidential material. A quick review of the docket sheet reveals the majority of the summary judgment materials have been filed under seal and the remainder does not appear to include confidential material.

### 2. Socially Intolerable Conduct

Conduct supporting an intentional infliction of emotional distress claim must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Christofferson v. Church of Scientology of Portland*, 57 Or. App. 203, 211 (1982) (quoting Restatement (Second) on Torts, § 46, comment d (1965)). The determination of whether the alleged conduct is an extraordinary transgression of the bounds of socially tolerable conduct is initially a question of law for the courts. *Delaney v. Clifton*, 180 Or. App. 119, 129 (2002). "Whether the conduct alleged is sufficiently extreme or outrageous to be actionable is a fact-specific inquiry, one to be made on a case-by-case basis considering the totality of the circumstances." *Id*. at 130.

Larry has also failed to establish the IIED Defendants' actions were socially intolerable. Dr. Ude performed a review of psychiatric evaluations and issued a two-page report summarizing her findings, something she had done thousands of times in the past. Costello's provision of the Evaluation to Dr. Ude facilitated her review and was in accordance with the terms of the Consent. Masthoff's discussion with Dr. Ude about the provision of records to Larry and his representation

to Larry that no records existed, as well as Dr. Cogburn and Dr. Ude's handling of their files, represent common occurrences in large agencies and offices. It is not unusual for files to be disorganized or documents misplaced, and Larry has failed to establish Masthoff lied to him about the existence of the requested records. This conduct does not even begin to reach the extreme or outrageous conduct Oregon law requires to support an intentional infliction of emotional distress claim. The IIED Defendants are entitled to summary judgment of Larry's claim for intentional infliction of emotional distress.

### C. Vicarious Liability

Under Oregon law and the doctrine of *respondeat superior*, a form of vicarious liability, "an employer is liable for an employee's torts when the employee acts within the scope of employment." *Chesterman*, 305 Or. at 442. To hold an employer liable under the doctrine, a plaintiff clearly must establish the employee committed a tort. Here, Larry fails to allege any defendant committed a tort. Rather, he asserts claims for intentional conduct, which the court has found should be dismissed. In the absence of any viable claim alleged against the IIED Defendants, Larry is unable to support a claim of vicarious liability against the State Defendants.

### D. Conclusion

Larry's state law claims are governed by the OTCA. Larry provided proper notice under the OTCA on March 23, 2016, limiting his claims to those based on losses or injuries occurring on or after September 24, 2015. Larry fails to establish the IIED Defendants acted with the intent to inflict emotional distress on Larry or that the offensive conduct was socially intolerable. In the absence of any viable claims, not to mention any negligence claims, against the IIED Defendants, Larry is unable to state a claim for vicarious liability against the State Defendants. Larry's Third and Fourth

Claims for Relief are dismissed.

## Conclusion

Defendants' motions (ECF Nos. 76, 104, and 107) for summary judgment are GRANTED.

DATED this 19th day of February, 2019.

      /s/ John V. Acosta
        JOHN V. ACOSTA
     United States Magistrate Judge